UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LIBERTY MUTUAL FIRE INSURANCE COMPANY; LM GENERAL INSURANCE COMPANY; LM INSURANCE CORPORATION; and SAFECO INSURANCE COMPANY OF ILLINOIS,<br><br>                    Plaintiffs,<br><br>v.<br><br>AMERICAN ANESTHESIA ASSOCIATES, LLC; TERENCE KIMBERG, CRNA; and DAVID WHITESELL, CRNA,<br><br>                    Defendants. | C.A. No. _____<br><br><br><br><br>**Demand for Jury Trial** |

## COMPLAINT

Plaintiffs Liberty Mutual Fire Insurance Company, LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois (hereinafter, "Liberty Mutual" and/or "plaintiffs"), by their attorneys KING, TILDEN, MCETTRICK & BRINK, hereby allege as follows.

## I.    INTRODUCTION

1.      This is a case about an anesthesia provider and its owners who engaged in a scheme to defraud Liberty Mutual by submitting false and fraudulent records, bills, and invoices through the U.S. Mail seeking to collect payment from Liberty

Mutual for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*.

2.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Liberty Mutual to the defendants.

3.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.     By this Complaint, and as detailed in each count set out below, Liberty Mutual brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.  Liberty Mutual also seeks declaratory relief that no previously-denied and pending insurance claims submitted to it by the defendants are compensable.

5.     As a result of the defendants' fraudulent acts, Liberty Mutual has paid in excess of $236,786 to them related to the patients at issue in this Complaint.

## II.   THE PARTIES

### A.   PLAINTIFFS

6.     LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois are companies duly organized and existing under the laws of the State of Illinois.

7.     Liberty Mutual Fire Insurance Company is a company duly organized and existing under the laws of the State of Wisconsin.

8.     LM General Insurance Company, LM Insurance Corporation, SAFECO Insurance Company of Illinois, and Liberty Mutual Fire Insurance Company each have their respective principal places of business in Boston, Massachusetts.

9.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.   DEFENDANTS

#### 1.   American Anesthesia Associates, LLC

10.    Defendant American Anesthesia Associates, LLC ("American Anesthesia") is a Michigan limited liability company that was organized under the laws of the State of Michigan on or about November 21, 2012.

11.    Defendants Terence Kimberg and David Whitesell are the members of American Anesthesia, and both are residents and citizens of the State of Michigan.

3

12.   At all times relevant to this Complaint, American Anesthesia conducted business in the Eastern District of Michigan.

13.   American Anesthesia billed Liberty Mutual for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Liberty Mutual insureds, including the patients set out in Exhibit 1.

### 2.   **Terence Kimberg, CRNA**

14.   Defendant Terence Kimberg, CRNA ("Kimberg") is a resident and citizen of the State of Michigan.

15.   At all relevant times, Kimberg operated and conducted American Anesthesia.

### 3.   **David Whitesell, CRNA**

16.   Defendant David Whitesell, CRNA ("Whitesell") is a resident and citizen of the State of Michigan.

17.   At all relevant times, Whitesell operated and conducted American Anesthesia.

## III.   **JURISDICTION AND VENUE**

18.   Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

19.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

20.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

21.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   **THE DEFENDANTS' FRAUDULENT SCHEME**

22.     Defendants American Anesthesia, Whitesell, and Kimberg (collectively, the "defendants") conspired to, and did, defraud Liberty Mutual through a scheme that was designed to exploit the medical benefits available under Michigan's No-Fault Act.

23.     Throughout the relevant period, the defendants conspired to bill outrageous charges for anesthesia services that were not medically necessary, deliberately exaggerated, and in many cases not actually provided.

24.     The vast majority of patients for whom American Anesthesia billed were allegedly undergoing minor, outpatient procedures that consisted of injections that take a matter of minutes to complete.

25.     These procedures were so minor that they are typically performed in an office setting with only a local anesthetic, but for the patients at issue herein were nearly always performed in a surgical setting solely to generate enormous bills to Liberty Mutual.

26.     The defendants also frequently used false and more expensive Current Procedural Terminology ("CPT")[1] codes in order to generate high fees for complex anesthesia services that they did not actually perform.

27.     Similarly, the defendants often used billing code descriptions that falsely described the patients they treated as having severe systemic health conditions in order to fraudulently claim a higher level of complexity and trigger additional bills to insurers like Liberty Mutual.

28.     The defendants' scheme, which is detailed below, resulted in hundreds of thousands of dollars of charges for improper, excessive, and medically unnecessary medical services, if such services were provided at all, submitted to Liberty Mutual.

29.     Defendant Kimberg, an owner of defendant American Anesthesia, has a lengthy history of misrepresentation in relation to purported healthcare services

---

[1] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

and disregard to standards of care in a manner similar to that described by this Complaint.

30.   For example, Kimberg was dismissed from the clinical portion of the University of Scranton's Nurse Anesthesia Program after it was determined that he posed a threat to the safety and welfare of patients.  *See* Exhibit 2.

31.   Kimberg was initially placed on probation on January 31, 2006 because "he constantly needed assistance; he did not appear to 'get the whole anesthetic process and priorities'; and other CRNAs opined that he was not at the appropriate level and they 'would not feel comfortable allowing him to administer anesthesia to their family members[.]'"  Id. at p. 5 (internal citations omitted).

32.   "Additionally, [Kimberg] was placed on probation for not adhering to core values such as integrity, teamwork, accountability, compassion and courtesy." Id. (internal citations omitted).

33.   The administrators of the Nurse Anesthesia Program "found that [Kimberg] did not adequately proceed through the probationary period" and decided to terminate Kimberg "from the Wyoming Health Care System/University of Scranton School of Nurse Anesthesia."  Id. at p. 6.

34.   The chairperson of the department of nursing at the University of Scranton testified that Kimberg was "insubordinate.  He gave medication that he was told not to give.  He was dangerous.  This is life and death."  *See* Exhibit 3 at p. 16.

35.     The program administrator of the Nurse Anesthesia Program and

Kimberg's ultimate supervisor provided examples of Kimberg's danger to patients:

> Q:     You're discussing student advocate and patient
>         advocate, and you said you become a patient
>         advocate when safety is involved, correct?
>
> A:     Uh-huh.
>
> Q:     At some point, did you feel that you had to become
>         a patient advocate because of Terry Kimberg?
>
> A:     Yes.
>
> Q:     What was the point?
>
> A:     In the clinical area, he – it was a series.  It wasn't
>         just one thing.  It was a series, where he would not
>         have a long round.  He was not prepared for the
>         case.  One of the other cases that I was with him on
>         was an elderly woman.  He went into the holding
>         area and he'd always told us that he was working as
>         an IV nurse.   And he had poked the woman a
>         number of times to the point where she had multiple
>         sticks.
>
>         And then one of the critical things that he did was
>         he put an IV in this woman.   She was very
>         uncomfortable and he let the IV out so far it was not
>         safe.  You couldn't start an anesthetic with the drugs
>         that we use when it's not into the vein far enough to
>         make sure that it was getting into the vein and not
>         into the surrounding tissues.
>
>         The case that I was with him on and he was in the
>         room, we were going to do a particular procedure
>         on this elderly woman.   And I looked at the
>         machine.  We went in before we brought the patient
>         in.

> And I looked at the machine.  And I said, "Terry,
> the blood pressure cuff is on pediatrics.  Can you
> put it on adult size?"  And he said, "No, I don't
> know how to do it."  I said – so I showed him how
> to do it.

*See* Exhibit 4 at pp. 184-185.

36.    The program administrator further testified that "there were other issues that Mr. Dushanko [ph] saw and Ms. Rameco [ph] saw, with drug – related drugs, that he decided – Mr. Kimberg decided to give half the drugs, and the patient's pressure was very high.  And that particular CRNA, who was so angry, said, 'Look, the pressure is so high she could have a stroke.  Why didn't you do what I asked you to do?'  And [Kimberg] said, 'I don't think she needs that much.'" Id. at p. 186.

37.    As detailed below, Kimberg and American Anesthesia have continued to disregard patient safety and standards of care in order to generate bills for No-Fault claims.

## V.    BILLING FOR SERVICES NOT RENDERED

38.    The defendants regularly submitted bills to Liberty Mutual seeking payment for services that were never rendered to patients at issue herein.

39.    Many of the bills submitted to Liberty Mutual by the defendants for services not actually performed were the result of the defendants' standard, fraudulent practices that were repeated for numerous patients at issue herein.

9

40.     For example, the defendants billed for the same nurse being in two places at once.  On January 30, 2020, an American Anesthesia Certified Registered Nurse Anesthetist ("CRNA") named Beverly Roberts billed for providing anesthesia to both L.B. (Claim No. 041162996)[2] and R.W. (Claim No. 039590258) on the same date and at the same time.

41.     American Anesthesia reported that the services to L.B. began at 11:50 a.m. and ended at 12:30 p.m. and that the services to Wise began at 12:05 p.m. and ended at 1:00 p.m.

42.     It is not possible that Roberts could have properly performed services as billed to both patients at the same time, and this is clear evidence of billing for services not rendered.

43.     Billing for anesthesia services is based upon the length of time the services are provided, and can only be counted when the physician or CRNA is continuously present with the patient.

A.    **BILLING FOR MONITORED ANESTHESIA CARE SERVICES NOT PERFORMED**

44.     The different CPT codes for anesthesia services reflect varying levels of difficulty and skill required for different procedures, and those codes are used in determining the payment amount for an anesthesia procedure.

---

[2] To protect the privacy of its insureds, Liberty Mutual refers to each herein by his or her initials and Liberty Mutual claim number.

45.     The defendants nearly always billed Liberty Mutual seeking payment for anesthesia services using CPT code 01936, and occasionally using CPT code 01992.  *See* Exhibit 1.

46.     CPT code 01936 signifies "Anesthesia for percutaneous image guided procedures on the spine and spinal cord; therapeutic."

47.     CPT Code 01992 signifies "Anesthesia for nerve block and injection procedure, prone position."

48.     CPT codes 01936 and 01992 both describe Monitored Anesthesia Care ("MAC"), which typically involves anesthetizing a patient to the point of unconsciousness (general anesthesia) or deep sedation.

49.     As explained by the American Society of Anesthesiologists ("ASA"),[3] MAC requires: (1) a pre-procedure evaluation of the patient to understand his or her coexisting medical conditions; (2) constant and exclusive monitoring of the patient while under anesthesia; (3) a readiness and ability to intervene to rescue a patient's airway from any sedation-induced compromise; and (4) post-procedure care and monitoring while the patient returns to consciousness.  *See* AMERICAN SOCIETY OF ANESTHESIOLOGISTS, "Distinguishing Monitored Anesthesia Care from Moderate

---

[3]The  ASA  is  an  educational,  research,  and  scientific  association  of physicians  organized  to  raise  the  standards  of  the  medical  practice  of anesthesiology and to improve patient care.

Sedation/Analgesia (Conscious Sedation)," (Last Amended: October 17, 2018 (original approval: October 27, 2004)), available at https://www.asahq.org/standards-and-guidelines/distinguishing-monitored-anesthesia-care-mac-from-moderate-sedationanalgesia-conscious-sedation (last accessed November 4, 2021).

50.     In contrast, patients who are given only mild or moderate sedation remain conscious, are able to respond to verbal commands, are able to breathe on their own, and do not require interventions to maintain their airway.  Id.

51.     When anesthesia services consist of mild or moderate sedation, the proper CPT code is 99156 for the first 15 minutes and 99157 for additional blocks of time.

52.     MAC is a much more highly skilled and more expensive service than conscious sedation.

53.     Anesthesia time for MAC is also compensated at a higher rate because it necessarily involves both pre- and post-procedure care that is *not* included in the billable anesthesia time.

54.     American Anesthesia fraudulently reported that it was performing MAC services using CPT codes 01936 and 01992 when in fact it was only providing mild sedation, if any services at all.

55.     American Anesthesia always billed for MAC services using codes 01936 and 01992, regardless of whether patients were only mildly sedated, and regardless of whether the patients had any underlying conditions that made mild sedation dangerous.

56.     Moreover, if patients were in such poor health that even mild sedation was dangerous, it would have been medically inappropriate and unnecessary to administer sedatives for the routine and minor pain management procedures that should have been performed with local anesthetic only.

57.     Accordingly, the defendants were using more highly skilled, more complex, and higher-priced CPT codes that did not describe the services they allegedly performed, but allowed them to bill Liberty Mutual at rates that were higher than the rates for the proper billing codes.

58.     Each instance in which the defendants billed using CPT codes 01936 or 01992 to Liberty Mutual for MAC services, but provided only conscious sedation (or nothing at all) is an instance of billing for a service that was not provided.

59.     Liberty Mutual is not required to pay the defendants for anesthesia services that were not rendered.

60.     As one example of the defendants' billing for MAC that was not rendered, American Anesthesia billed for allegedly providing MAC services to

patient S.T. (Claim No. 032876763) on March 3, 2017 for over an hour during an injection procedure.

61.     The physician, however, reported that the procedure could not be completed because the patient twice screamed in pain and then told the physician to stop.

62.     Clearly, this patient was conscious and able to communicate with the physician and was only mildly sedated, if she was sedated at all.

63.     The defendants billed for an hour of anesthesia time thereby representing to Liberty Mutual that the patient was actually unconscious or "deeply sedated" for that period of time, which is particularly egregious given that the entire procedure should have taken less than half that time and it was not even completed.

64.     Further, there was no possible justification for giving this patient elevated MAC services due to a concern that mild sedation could be dangerous, as she was 37 years old with no chronic systemic conditions and her attorneys supplied Liberty Mutual with her pre-injury medical records to show that she had no prior health problems.

### B.     BILLING FOR EXCESSIVE ANESTHESIA TIME

65.     Anesthesia time begins when the anesthesia provider is present and personally begins to prepare the patient for the induction of anesthesia in the operating room or in an equivalent area.

14

66.     Anesthesia time does not include time performing the pre-anesthesia assessment.

67.     Anesthesia time ends when the anesthesia provider turns the care of the patient over to the postsurgical recovery team, and is no longer in personal attendance of the patient.

68.     Anesthesia time is measured in minutes of continuous monitoring between the start and end times, which is then reported in units of 15 minutes to the tenth of a unit (1.5 minutes).

69.     Accordingly, the time billed for the provision of anesthesia should closely match the time billed for the underlying procedure for which the anesthesia was given.

70.     In many instances, however, American Anesthesia billed for allegedly providing anesthesia for a significantly greater time than it took for the procedure itself to be performed.

71.     The injection procedures during which American Anesthesia was allegedly anesthetizing patients are relatively simple outpatient procedures that are often performed in a doctor's office with only a local anesthetic.

72.     A single injection procedure typically takes five (5) minutes or less, and even more involved procedures, such as those with multiple injections or the use of fluoroscopy, typically take less than thirty (30) minutes to perform.

73.   Because anesthesia time begins in the procedure room and ends when care is handed over to a post-procedure recovery team, the anesthesia time recorded for these procedures should be very close to the overall procedure time.

74.   American Anesthesia routinely and fraudulently inflated its recorded time during these procedures, often billing for more than an hour of anesthesia time.

75.   The following are examples of the defendants billing for anesthesia times well in excess of the time needed to perform the underlying procedure, which constitutes billing for anesthesia services not performed:

- American Anesthesia billed for anesthesia related to an injection procedure to patient L.M. (Claim No. 037468325) on August 1, 2018. American Anesthesia claimed to have provided 85 minutes of anesthesia time to L.M., from 11:00 a.m. to 12:25 p.m. The physician signed his procedure note at 12:23 p.m., and the note expressly discussed time the patient spent in the recovery room, which necessarily occurred prior to 12:23 p.m. On September 5, 2018, American Anesthesia billed for 88 minutes of anesthesia time to L.M. The physician recorded that the procedure to L.M. on September 5, 2018 began at 9:30 a.m., but American Anesthesia began billing more than an hour earlier at 8:22 a.m.

- On January 30, 2020, patient L.B. (Claim No. 041162996) allegedly received a steroid injection for which she was in the operating room for twenty (20) minutes. However, American Anesthesia billed for anesthesia time of forty (40) minutes – double the time the patient was in the operating room.

- American Anesthesia billed for anesthesia relative to two (2) epidural steroid injections to patient J.B. (Claim No. 028733845) in January 2017. Even with fluoroscopy, these procedures should have been performed in twenty (20) minutes or less. On January 4, 2017, defendant Whitesell billed for 75 minutes of anesthesia time to J.B. On January 18, 2017, defendant Kimberg billed for an incredible 92 minutes of anesthesia time to J.B. Notably, on the latter date, American Anesthesia billed for anesthesia time ending at 11:17, despite the fact that the patient was recorded as entering post-procedure care

16

at 11:07, which is clearly impermissible billing for anesthesia after the procedure had already ended.

- Similarly, American Anesthesia billed for two epidural steroid injections in June 2019 to patient R.M. (Claim No. 037468325) that were allegedly performed by the same physician. On June 5, 2019, American Anesthesia billed for 68 minutes of anesthesia. The physician signed his operative note describing the procedure at 8:58 a.m., which was necessarily after the procedure concluded, but American Anesthesia billed for administering anesthesia until 9:08 a.m. On June 19, 2019, American Anesthesia billed for 53 minutes of anesthesia to R.M. In this instance, the physician signed his procedure note at 11:17 a.m. and his records contain a note that "[t]he patient was checked out at 11:02 by Robert P. Farhat." American Anesthesia continued billing until 11:48, more than forty-five (45) minutes after the patient had been discharged by the physician.

- Patient G.Z.'s (Claim No. 179773765033) physician billed for six (6) different injection procedures on separate dates. These routine injections lasted a matter of minutes. American Anesthesia, on each occasion, billed for between thirty-five (35) minutes to a full 60 minutes of anesthesia time with no explanation for the excessive duration.

- On January 9, 2020, American Anesthesia billed for forty (40) minutes of anesthesia time to patient R.W. (Claim No. 039590258), even though the patient was in the operating room for a total of only thirty-two (32) minutes.

- American Anesthesia billed for anesthesia services relative to an injection to patient W.M. (Claim No. 032655735) on May 1, 2019 that the physician recorded as beginning at 10:30 a.m. The physician dictated and signed a note describing the procedure at 11:10 a.m. American Anesthesia claimed its anesthesia time as beginning at 10:15 a.m., before the underlying procedure started, and the end of the anesthesia time as 11:10 a.m., exactly the same time the physician signed the procedure note, which must necessarily have been some time after the procedure itself was over.

## VI. UNLAWFULLY ADMINISTERED ANESTHESIA

76. The defendants improperly billed Liberty Mutual for anesthesia services that were administered by individuals who are licensed in the State of Michigan as only CRNAs and whom were not supervised.

77. Any anesthesia services provided by these CRNAs while they were not supervised by a licensed physician were in contravention of Michigan law.

78. The Michigan Attorney General has long declared that a registered nurse can legally administer an anesthetic only when under the supervision and direction of a registered physician. *See* 1940 Mich. Op. Att'y Gen. 308.

79. The Office of the Attorney General of the State of Michigan again determined that providing anesthesia services "require[d] medical delegation and supervision under the Public Health Code because the service is within the 'practice of medicine[.]'" 1989 Mich. AG LEXIS 11, *9 (Mich. AG 1989*).

80. The Michigan Legislature has also confirmed that a CRNA engages in the unlawful practice of medicine every time he or she independently provides anesthesia services to a patient without the supervision of a licensed physician.

81. However, there was no licensed physician who supervised each CRNA during the alleged administration of the anesthesia services that are at issue in this Complaint.

82.     Moreover, the licensed medical professionals who performed the underlying procedures for which the anesthesia services at issue in this Complaint were purportedly performed likewise did provide the required supervision to the American Anesthesia CRNAs.

83.     Because a nurse cannot engage in the practice of medicine, a CRNA may legally administer anesthesia to a patient only when delegated by a licensed physician who also supervises the CRNA.  *See* Mich. Comp. Laws § 333.16215(1).

84.     The failure of the defendants to identify a licensed medical physician who supervised the purported administration of anesthesia by a CRNA, coupled with the lack of documentation that supervision was provided to CRNAs by the licensed medical professionals who purportedly performed the underlying procedures, confirms that the defendants administered anesthesia without supervision, which is a violation of Michigan law.

85.     For example, on December 9, 2019, American Anesthesia billed for services allegedly provided to patient T.R. (Claim No. 038866860) with no documentation that T.R.'s physician provided the required supervision of the American Anesthesia CRNA.  Notably, this physician billed for the alleged administration of Propofol despite stating in an associated record that, "IV general sedation was administered by a licensed CRNA."

86.     In another example, on March 18, 2019, during an injection procedure for patient W.M. (Claim No. 032655735), the physician recorded "IV anesthesia administered by board certified provider (CRNA)" but there is no evidence that he provided the required supervision, and he also separately billed for his own alleged provision of anesthesia.

87.     American Anesthesia nearly always billed Liberty Mutual using the modifier QZ to denote that anesthesia was provided by a CRNA without oversight by an anesthesiologist.  This means that American Anesthesia's alleged provision of services could only have been lawful if the CRNA was supervised by the physician performing the underlying procedure.  But as explained in Section V, *supra*, American Anesthesia routinely billed anesthesia time well in excess of the time the physician was present in the procedure room.  Accordingly, the defendants were either unlawfully providing anesthesia, lying about the amount of time spent providing it, or both.

88.     Liberty Mutual is not required to pay the defendants for anesthesia services billed in violation of Michigan law.

## VII.    <u>UNREASONABLE   AND   UNNECESSARY   FRAUDULENT   TREATMENT</u>

89.     The goal of the defendants and their associates was to bill for as much treatment as possible, regardless of whether such treatment was reasonably

necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Liberty Mutual.

90.     The defendants' purported treatment violated established standards of care in the medical community, as the vast majority of services were not medically necessary and were excessive for the minor procedures allegedly performed on the patients at issue herein.

91.     The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Liberty Mutual until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

92.     The unnecessary services billed by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the chart annexed hereto at Exhibit 1.

93.     All of the claims submitted by the defendants to Liberty Mutual through the U.S. Mail seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

94.     None of the fraudulent claims submitted by the defendants are compensable under applicable statutes and regulations.

95.    Liberty Mutual is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

96.    None of the above facts were known to Liberty Mutual until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Liberty Mutual by the defendants

97.    As detailed above, the defendants fraudulently submitted bills to Liberty Mutual for treatment and services that were not actually rendered to patients at issue in this Complaint.

98.    The defendants also billed Liberty Mutual for anesthesia services that were not necessary and violative of the established standard of care.

99.    Anesthesiology is a discipline within the practice of medicine that involves the safeguarding and medical management of patients who are rendered unconscious and/or insensible to pain and emotional distress during medical procedures.

100.    The procedures at issue in this Complaint are mostly routine injection procedures that the American Society of Anesthesiologists ("ASA") considers minor pain procedures.

101.    According to the ASA, "the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia.  Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, occipital nerve block and facet injections."

102.    The ASA further states that "[t]he use of general anesthesia for routine pain procedures is warranted only in unusual circumstances," which rarely present themselves.

103.    Indeed, the ASA has expressly warned that unnecessary use of anesthesia for routine injections a risky practice that is a major factor in the occurrence of inadvertent neural injury.

104.    However, for almost every instance in which the defendants submitted a bill to Liberty Mutual seeking payment for the alleged administration of general anesthesia regarding patients at issue in this Complaint, the underlying procedure was a minor pain procedure such as an epidural steroid injection.

105.    As explained in Section V, *supra*, American Anesthesia always billed for higher-priced general anesthesia and MAC services rather than the lower-priced conscious sedation.  Thus, American Anesthesia represented that all of these patients allegedly undergoing minor pain procedures received not just mild or moderate sedation, but full, general anesthesia for long periods of time.

106.   Subjecting patients to an hour of general anesthesia for routine injections, without any medical basis, resulted in patients taking unnecessary risks of infection, airway obstruction, and other risks associated with anesthesia.

107.   It was particularly dangerous for the defendants to bill for medically unnecessary anesthesia services while at the same time (falsely, as detailed below) representing that the same patients had severe systemic illnesses that caused the purported services to be considered complex and thus billed at higher rates.

108.   For example, bills submitted by the defendants relative to patient G.Z. (Claim No. 179773765033) used CPT code modifier P3, which represented that the patient had severe systemic disease such that the defendants were entitled to charge more for their purported services.

109.   Despite allegedly having severe disease that created a risk factor for anesthesia, the defendants billed for purported general anesthesia for routine procedures such as epidural steroid injections related to G.Z. on at least five (5) separate dates in less than one (1) year.

110.   Similarly, the defendants billed for anesthesia for routine pain management injections to patient B.M. (Claim No. 038075242), whose risk was particularly high as she was reported to have several underlying conditions that presented risks of complication, in addition to being on a variety of prescription medications.

111.    The defendants have not and cannot demonstrate the medical necessity for allegedly administering general anesthesia or sedation to patients at issue in this Complaint during minor pain procedures.

## VIII.  <u>FRAUDULENT BILLING OF CPT CODE MODIFIERS</u>

112.    CPT code modifiers add information beyond the base CPT code and are used to adjust the price of services rendered.  While the CPT code describes the nature of the anesthesia service provided, the modifiers add information about the medical status of the patient receiving anesthesia and about who provided the anesthesia services.

113.    The "P" modifier is the physical status modifier that describes the condition of the patient receiving anesthesia.

114.    Physical status modifiers identify levels of complexity of the anesthesia services by describing the condition of the patient.  The modifiers are defined as follows:

- P1: A normal healthy patient
- P2: A patient with mild systemic disease
- P3: A patient with severe systemic disease
- P4: A patient with severe systemic disease that is a constant threat to life
- P5: A moribund patient who is not expected to survive without the operation
- P6: A declared brain-dead patient whose organs are being removed for donor.

115.   Physical status modifiers P1 and P2 denote a normal healthy patient or a patient with minimal risk factors and do not affect the charge or reimbursement amount for the anesthesia services.

116.   However, the P3 physical status modifier allows for an anesthesia provider to submit a higher charge for the particular anesthesia at issue because of the patient's "severe systemic disease."  For this reason, the defendants frequently and falsely elevated their patients' statuses to P3 without a corresponding indication in the patients' records that their condition was or had become significantly worse.

117.   By way of example, patient S.T. (Claim No. 032876763) was described as P3 despite the fact that she was 37 years old at the time of the billing, with no chronic systemic conditions mentioned in her medical records or procedure notes. Her attorneys even supplied Liberty Mutual with her pre-injury medical records to show that she had no prior conditions, and certainly had no "severe systemic illness."

118.   American   Anesthesia   described   patient   G.Z.   (Claim   No. 179773765033) variably as either P2 or P3 with no evidence of why there were changes.

119.   Patients   P.M.   (Claim   No.   038111193)   and   R.W.   (Claim   No. 039590258) were also assigned P3 modifiers by the defendants with no support in their records that they had severe systemic diseases.

120.   Patient C.A. (Claim No. 33773736) was variably described as P2 or P3 in relation to the nine (9) injections for which American Anesthesia billed between June 2017 and February 2018.  On August 30, 2017 and again on February 7, 2018, she was described by American Anesthesia as a P2 patient with a mild systemic disease.  On each of the other seven (7) occasions, American Anesthesia billed for treating her as a P3 patient with no explanation of why her underlying condition had supposedly changed.

121.   American Anesthesia described patient S.C. (Claim No. 042147538) as P3 on June 3, 2020.  Just a month later, on July 1, 2020, American Anesthesia described her as P2.  Then, for two (2) alleged injection procedures on October 21 and 28, 2020, American Anesthesia returned to billing for S.C. as a P3 patient without any basis or explanation.

122.   During the relevant period, American Anesthesia used the P3 modifier by default, recording alleged patient encounters as P3 at least twice as often as it recorded P2, and charging, on average, hundreds of dollars more for P3 encounters.

## IX.   EXCESSIVE ANESTHESIA CHARGES

### A.   MICHIGAN LAW REGARDING REASONABLE AND CUSTOMARY CHARGES

123.   As discussed *supra*, the defendants billed for anesthesia services that, if performed at all, were unlawful, unnecessary, and were performed only to financially benefit the defendants and not to aid in the treatment of patients.

27

124.   In addition to being unnecessary and unwarranted for the reasons discussed above, American Anesthesia also charged such unreasonable and excessive amounts for the anesthesia services allegedly rendered as to be fraudulent within the meaning of Mich. Comp. Laws § 500.3148(2).

125.   Michigan courts have stated explicitly that "medical care providers are prohibited from charging more than a reasonable fee."  McGill v. Auto. Ass'n, 207 Mich. App. 402, 405 (1994).

126.   "Under [Michigan's No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the product or service itself is not reasonably necessary." Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

127.   "In order for a no-fault insurer to be responsible for a particular expense, three requirements must be satisfied: (1) the expense must have been incurred by the insured, (2) the expense must have been for a product, service, or accommodation reasonably necessary for the injured person's care, recovery, or rehabilitation, and (3) the amount of the expense must have been reasonable." Hamilton v. AAA Mich., 248 Mich. App. 535, 543 (2001) (emphasis added).

128.   The Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses thereunder.  Mich. Comp. Laws § 500.3107(1)(a).

129.   Michigan Compiled Laws § 500.3157(1) further provides that "[t]he charge must not exceed the amount the person customarily charges for like treatment or training in cases that do not involve insurance."

130.   A provider "bears the burden of proving both the reasonableness and the customariness of its charges . . . ." Munson Medical Ctr. v. Auto Club Ins. Ass'n, 218 Mich. App. 375, 385 (1996) (emphasis added).

131.   Insurers are not required "to accept health care providers' unilateral decisions regarding what constitutes reasonable medical expenses . . . ." McGill, 207 Mich. App. at 408.

## B. AMERICAN ANESTHESIA SUBMITTED EXCESSIVE AND UNREASONABLE CHARGES FOR ANESTHESIA

132.   Throughout the relevant period, American Anesthesia routinely charged Liberty Mutual outrageous amounts for anesthesia services during minor outpatient injection procedures that are typically performed with nothing more than a local anesthetic.  The amounts they charged were many times the average charge submitted to Medicare for the same services in the state of Michigan.

133.   The Centers for Medicare and Medicaid Services ("CMS") maintains data on the prices charged by providers for various CPT codes.  The 2017 through 2019 data for the State of Michigan (the three most recent years for which data is publicly available) reveals that American Anesthesia's charges are grossly excessive.

134.   The data compiled by CMS includes all providers of anesthesia services, including anesthesiologists, medical doctors (M.D.s), and Doctors of Osteopathy (D.O.s), not merely CRNAs.  Thus, American Anesthesia charged far more than even anesthesiologists did, not just other nurse anesthetists.

135.   The average charges according to CMS are as follows:

- CPT code 01936 "Anesthesia for percutaneous image guided procedures on the spine and spinal cord; therapeutic":

| Year | Region | Number of Providers | Number of Charges submitted | Setting | Average Charge |
|------|--------|---------------------|------------------------------|---------|----------------|
| 2017 | Michigan | 1,524 | 11,364 | Facility | $1,025.67 |
| 2017 | Michigan | 100 | 3,728 | Office | $1,475.59 |
| 2018 | Michigan | 1,539 | 12,162 | Facility | $1,130.16 |
| 2018 | Michigan | 117 | 4,134 | Office | $1,207.61 |
| 2019 | Michigan | 1,561 | 12,309 | Facility | $1,236.05 |
| 2019 | Michigan | 120 | 3,913 | Office | $1,420.32 |

The average charge billed by American Anesthesia to Liberty Mutual for CPT Code 01936 from 2017 through present was $6,324.10.

- CPT code 01992 "Anesthesia for diagnostic or therapeutic nerve blocks and injections; prone position":

30

| Year | Region | Number of Providers | Number of Charges submitted | Setting | Average Charge |
|------|--------|---------------------|-----------------------------|---------|----------------|
| 2017 | Michigan | 410 | 5,252 | Facility | $1,080.50 |
| 2017 | Michigan | 72 | 1,640 | Office | $1,207.02 |
| 2018 | Michigan | 329 | 4,942 | Facility | $1,217.41 |
| 2018 | Michigan | 65 | 1,588 | Office | $1,116.14 |
| 2019 | Michigan | 355 | 4,506 | Facility | $1,276.76 |
| 2019 | Michigan | 82 | 2,105 | Office | $973.04 |

The average charge submitted by American Anesthesia to Liberty Mutual for CPT Code 01992 from 2017 through present was $6,187.57.

136. The above figures are the amounts charged by providers, not the amounts paid by CMS, which are considerably lower.

137. American Anesthesia's charges are clearly well outside the range of reasonableness and the defendants cannot sustain their burden of proving otherwise.

## X.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY LIBERTY MUTUAL

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

138. To induce Liberty Mutual to pay promptly their fraudulent charges, the defendants submitted to Liberty Mutual false documentation that materially misrepresented that the services they billed were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

31

139.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

140.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

141.   Thus, every time the defendants submitted bills and medical records to Liberty Mutual supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

142.   There are no less than six (6) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Liberty Mutual:

a. American Anesthesia frequently billed for services that were not performed at all.

b. American Anesthesia billed for monitored anesthesia care when, at most, mild sedation was performed.

c. American Anesthesia routinely falsified the time of anesthesia services claimed, so much so that the anesthesia time billed frequently exceeded the length of the entire underlying procedure including post-procedure recovery.

    d.  American Anesthesia unlawfully billed for anesthesia allegedly administered by CRNAs without the required physician supervision.

    e.  American Anesthesia billed for allegedly providing general anesthesia or sedation during routine injection procedures where only a local anesthetic was medically indicated, and the additional anesthesia charged by the defendants violated established standards of care.

    f.  American Anesthesia fraudulently upcoded its CPT code modifiers to charge higher rates for providing anesthesia to patients with allegedly severe underlying conditions when no such conditions existed.

143.   As detailed *supra*, the defendants frequently violated established standards of care, charged excessively, and billed for services without basis or adequate substantiation.

144.   If anesthesia services are not required for a patient's care, recovery, or rehabilitation, such services are not medically necessary.

145.   The foregoing facts – billing for services not rendered, unlawfully providing anesthesia, inflating anesthesia time, billing for multiple providers, charging for unnecessary anesthesia, and fraudulently upcoding – were not, and could not have been, known to Liberty Mutual until it commenced its investigation of the defendants shortly before the filing of this action.

146.   Liberty Mutual had no access to information or documents exposing the defendants' fraudulent conduct until it conducted the investigation that led to the filing of this action.

147.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the anesthesia services charged by the defendants unnecessary and unlawful.

148.   The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the chart annexed at Exhibit 1.

149.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act mailed to Liberty Mutual by the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

150.   Moreover, each health insurance claim form (HICF) submitted to Liberty Mutual by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

151.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Liberty Mutual via the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the anesthesia services for which they billed Liberty Mutual.

152.   As the defendants did not render lawful and reasonably necessary medical treatment, and misrepresented the treatment purportedly performed, each bill and accompanying documentation mailed by the defendants to Liberty Mutual constitutes a material misrepresentation.

### B.   LIBERTY MUTUAL'S JUSTIFIABLE RELIANCE

153.   The facially valid documents submitted to Liberty Mutual by the defendants were designed to, and did in fact, induce Liberty Mutual to rely on the documents.

154.   At all relevant times, the defendants concealed from Liberty Mutual facts regarding the fact, lawfulness, and medical necessity of services allegedly provided by them to prevent Liberty Mutual from discovering that the insurance claims submitted by the defendants were not compensable under the Michigan No-Fault Act.

155.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of anesthesia services in order to seek payment under Michigan's No-Fault Act.

156.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Liberty Mutual began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

157.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Liberty Mutual did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

158.   In reliance on the defendants' misrepresentations, Liberty Mutual paid money to the defendants to its detriment.

159.   Liberty Mutual would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the anesthesia services billed.

160.   As a result, Liberty Mutual has paid in excess of $236,786 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XI.   MAIL FRAUD RACKETEERING ACTIVITY

161.   As detailed above, the anesthesia services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

162.   The objective of the scheme to defraud Liberty Mutual, which occurred throughout the period noted in Exhibit 1, was to collect No-Fault benefits to which the defendants were not entitled because the anesthesia services rendered, if at all,

were not necessary, were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

163.   This objective necessarily required the submission of bills for payment to Liberty Mutual.

164.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

165.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

166.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, insurance payments, and the return of cancelled checks.

167.   It was foreseeable to the defendants that submitting bills and medical records to Liberty Mutual would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Liberty Mutual.

168.   Every payment at issue in this Complaint where Liberty Mutual was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Liberty Mutual using the U.S. Mail.

169.   The fraudulent medical billing scheme detailed herein generated hundreds of mailings.

170.   A chart highlighting representative examples of mail arising from the defendants' patient/business files is annexed hereto at Exhibit 5.

171.   As detailed herein, the defendants also submitted bills for payment to Liberty Mutual via the U.S. Mail related to each exemplar patient discussed in this Complaint.

172.   It was within the ordinary course of business for American Anesthesia to submit claims for No-Fault payment to insurance carriers like Liberty Mutual through the U.S. Mail.

173.   Moreover, the business of billing for medical services by American Anesthesia is regularly conducted by fraudulently seeking payment to which American Anesthesia is not entitled through the use of fraudulent communications sent via the U.S. Mail.

174.   In other words, discrete (claim- and patient-specific) instances of mail fraud are a regular way of doing business for American Anesthesia.

175.   American Anesthesia, at the direction and with the knowledge of its owners and managers Whitesell and Kimberg, continues to submit claims for payment to Liberty Mutual and continues to commence litigation against Liberty Mutual seeking to collect on unpaid claims.

176.   Thus, the defendants' commission of mail fraud continues.

177.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Liberty Mutual by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

178.   Liberty Mutual reasonably relied on the submissions it received from American Anesthesia, and its owners Whitesell and Kimberg, including the representative submissions set out in Exhibits 1 and 5 annexed hereto and identified in the exemplar claims above.

179.   As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Liberty Mutual's damages.

## XII.  **DAMAGES**

180.   The pattern of fraudulent conduct by the defendants injured Liberty Mutual in its business and property by reason of the aforesaid violations of law.

181.   Although it is not necessary for Liberty Mutual to calculate damages with specificity at this stage in the litigation, and its damages continue to accrue, Liberty Mutual's injury includes, but is not limited to, compensatory damages in excess of $236,786.

182.    Exhibit 6, annexed hereto and incorporated herein as if fully set forth in its entirety, identifies monies paid by Liberty Mutual to American Anesthesia by date, payor, payee, patient claim number, check number, and amount.

183.    Liberty Mutual's claim for compensatory damages, as set out in Exhibit 6, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

184.    Every payment identified in Exhibit 6 was made by Liberty Mutual alone.

185.    Moreover, every payment identified in Exhibit 6 derives from a check sent by Liberty Mutual to the defendants through the U.S. Mail.

186.    As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only mailed medical records and bills for the purpose of having Liberty Mutual rely on such documents and mail payment in response thereto.

187.    Liberty Mutual also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

188.   Liberty Mutual investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIII.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (American Anesthesia Enterprise)
### Against David Whitesell, CRNA and Terrence Kimberg, CRNA

189.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 188 set forth above as if fully set forth herein.

190.   American Anesthesia constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

191.   In connection with each of the claims identified in the within Complaint, Whitesell and Kimberg ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by American Anesthesia, or knew that such false medical documentation would be mailed in the ordinary course of American Anesthesia's business, or should have reasonably foreseen that the mailing of such false medical documentation by American Anesthesia would occur, in furtherance of the Count I defendants' scheme to defraud.

192.   The Count I defendants knew that two (2) or more mailings would be sent to demand and receive payment from Liberty Mutual on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 5.

193.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Liberty Mutual for medical services that were purportedly performed by American Anesthesia, which they knew would be billed by American Anesthesia, in order to collect payment from Liberty Mutual under applicable provisions of the Michigan No-Fault Act.

194.   Whitesell and Kimberg owned, managed, and controlled American Anesthesia, and were responsible for all actions taken by American Anesthesia and its staff.

195.   The Count I defendants submitted false and fraudulent medical records, bills, and invoices that created the appearance of lawful and compensable anesthesia charges, which permitted American Anesthesia to continue billing for unlawful and medically unnecessary anesthesia.

196.   As a result of, and in reasonable reliance on, these misleading documents and representations, Liberty Mutual, by its agents and employees, issued payment drafts to American Anesthesia for the benefit of the Count I defendants that would not otherwise have been paid.

197.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

198.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (American Anesthesia Enterprise)
### Against David Whitesell, CRNA and Terrence Kimberg, CRNA

199.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 188 set forth above as if fully set forth herein.

200.   Defendants Whitesell and Kimberg ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of American Anesthesia.

201.   The Count II defendants each agreed to further, facilitate, support, and operate the American Anesthesia enterprise.

202.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

203.   The purpose of the conspiracy was to obtain insurance payments from Liberty Mutual on behalf of American Anesthesia even though American Anesthesia was not eligible to collect such payments by virtue of its unlawful conduct.

204.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Liberty Mutual of insurance claim and medical record documents containing material misrepresentations.

205.   Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

206.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Liberty Mutual and Liberty Mutual is entitled to recover from each three times the damages sustained by reason of the claims submitted by and on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## COMMON LAW FRAUD
### Against All Defendants

207.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 188 set forth above as if fully set forth herein.

208.   The scheme to defraud perpetrated by defendants American Anesthesia, Whitesell, and Kimberg ("Count III defendants") was dependent upon a

succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

209.   The misrepresentations of fact made by the Count III defendants include, but are not limited to, those material misrepresentations discussed in section X.A, *supra*.

210.   The Count III defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

211.   The misrepresentations were intentionally made by the Count III defendants in furtherance of their scheme to defraud Liberty Mutual by submitting non-compensable claims for payment under the Michigan No-Fault Act to Liberty Mutual.

212.   The Count III defendants' misrepresentations were known by them to be false and were made for the purpose of inducing Liberty Mutual to make payments for claims that are not compensable under Michigan law.

213.   Liberty   Mutual   reasonably   relied   upon   such   material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

214. As a direct and proximate result of the defendants' fraudulent representations and acts, Liberty Mutual has been damaged in its business and property as previously described herein.

## COUNT VI
## CIVIL CONSPIRACY
## Against All Defendants

215. Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 188 set forth above as if fully set forth herein.

216. Defendants American Anesthesia, Whitesell, and Kimberg ("Count IV defendants") combined and concerted to accomplish the unlawful purpose of defrauding Liberty Mutual by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not provide the anesthesia services billed to Liberty Mutual, (2) the defendants did not provide reasonably necessary anesthesia services, (3) the defendants did not lawfully administer anesthesia, and (4) the defendants engaged in fraudulent billing practices, as described above.

217. The Count IV defendants worked together to achieve an unlawful purpose (namely, defrauding Liberty Mutual for personal gain).

218. This purpose was known to all of the Count IV defendants and intentionally pursued by them.

219.    Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because services were not lawfully rendered, and because they engaged in fraudulent billing practices, the Count IV defendants nonetheless submitted insurance claims (with accompanying false medical documentation) to Liberty Mutual seeking payment.

220.    In reasonable reliance on the false medical documentation submitted by the defendants, Liberty Mutual paid certain of the claims submitted.

221.    All of the Count IV defendants directly benefited from the payments made to American Anesthesia, including its owners Whitesell and Kimberg.

222.    All of the Count IV defendants actively and intentionally partook in a scheme to defraud Liberty Mutual and also encouraged and aided other Count IV defendants in the commission of acts done for the benefit of all Count IV defendants and to the unjustified detriment of Liberty Mutual.

223.    Accordingly, all of the Count IV defendants are equally liable for the fraud perpetrated on Liberty Mutual pursuant to their conspiracy.

## COUNT V
### PAYMENT UNDER MISTAKE OF FACT
### Against American Anesthesia Associates, LLC

224.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 188 set forth above as if fully set forth herein.

225.   Liberty Mutual paid the amounts described herein and itemized in Exhibit 6 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Liberty Mutual by misrepresenting the fact, lawfulness, and necessity of medical services purportedly provided by American Anesthesia.

226.   Liberty Mutual sustained damages by paying under a mistake of fact the claims submitted by American Anesthesia, which misrepresented the fact, reasonableness, necessity, and lawfulness of the anesthesia services billed.

227.   American Anesthesia would be unjustly enriched if permitted to retain the payments made to it by Liberty Mutual under a mistake of fact.

228.   Liberty Mutual is entitled to restitution from American Anesthesia for all monies paid to and/or received by it from Liberty Mutual.

229.   American Anesthesia's retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT VI
## UNJUST ENRICHMENT
**Against All Defendants**

230.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 188 set forth above as if fully set forth herein.

231.   Defendants American Anesthesia, Whitesell, and Kimberg ("Count VI defendants") submitted claims to Liberty Mutual that caused Liberty Mutual to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

232.   Liberty Mutual's payments constitute a benefit that the Count VI defendants aggressively sought and voluntarily accepted.

233.   The Count VI defendants wrongfully obtained and benefited from payments from Liberty Mutual through the fraudulent scheme detailed herein.

234.   The Count VI defendants have been unjustly enriched by receipt of and benefit from these wrongfully obtained payments from Liberty Mutual.

235.   The Count VI defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT VII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against All Defendants**

236.   Liberty Mutual re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 188 set forth above as if fully set forth herein.

237.   Defendants American Anesthesia, Whitesell, and Kimberg ("Count VII defendants") routinely billed for unnecessary and unlawful anesthesia services with respect to the patients at issue in this Complaint.

238.   The Count VII defendants also billed for services not rendered.

239.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105 and 500.3107.

240.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

241.   The lack of lawfully-rendered treatment is also a defense to an insurer's obligation to pay No-Fault benefits.  Mich. Comp. Laws § 500.3157(1).

242.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

243.   The Count VII defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Liberty Mutual, and other claims remain pending with Liberty Mutual.

244.   The Count VII defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Liberty Mutual has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count VII defendants for any or all of the reasons set out in the within Complaint.

245.   Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants billed for unnecessary and unlawful anesthesia services that are not compensable under applicable provisions of the Michigan's No-Fault Act.

246.   Liberty Mutual also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful services and submitted unreasonable charges for the same to Liberty Mutual at all relevant times.

247.   As such, the Count VII defendants have no standing to submit, pursue, or receive benefits or any other payment from Liberty Mutual, and Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants cannot seek payment from Liberty Mutual for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any

other claim for payment related to the fraudulent conduct detailed in the within Complaint.

248.   Liberty Mutual further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VII defendants cannot balance bill or otherwise seek payment from any person insured under a Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XIV.  DEMAND FOR RELIEF

WHEREFORE, plaintiffs Liberty Mutual Fire Insurance Company, LM General Insurance Company, LM Insurance Corporation, and Safeco Insurance Company of Illinois respectfully pray that judgment enter in their favor, as follows:

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (American Anesthesia Enterprise)
### Against David Whitesell, CRNA and Terrence Kimberg, CRNA

(a)   AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (American Anesthesia Enterprise)
### Against David Whitesell, CRNA and Terrence Kimberg, CRNA

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Liberty Mutual treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Liberty Mutual injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT IV
### CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Liberty Mutual its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT V
### PAYMENT UNDER MISTAKE OF FACT
### Against American Anesthesia Associates, LLC

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT VI
### UNJUST ENRICHMENT
### Against All Defendants

(a)     AWARD Liberty Mutual its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT VII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Liberty Mutual has no obligation to pay pending and previously-denied No-Fault insurance claims submitted by American Anesthesia Associates, LLC, David Whitesell, CRNA, and Terrence Kimberg, CRNA, jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that American Anesthesia Associates, LLC, David Whitesell, CRNA, and Terrence Kimberg, CRNA, jointly and severally, cannot seek payment from Liberty Mutual pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that American Anesthesia Associates, LLC, David Whitesell, CRNA, and Terrence Kimberg, CRNA, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under a Liberty Mutual policy or for whom Liberty Mutual is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XV.  **JURY DEMAND**

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

KING, TILDEN, MCETTRICK & BRINK,

*/s/ Jacquelyn A. McEttrick*

_____

Nathan A. Tilden (P76969)
ntilden@ktmpc.com
Jacquelyn A. McEttrick
jmcettrick@ktmpc.com
Andrew H. DeNinno
adeninno@ktmpc.com
William G. Potter
wpotter@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated: November 5, 2021          *Attorneys for Plaintiffs*